**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| WILLIAM SIMPSON and MELODY SIMPSON, | CIVIL ACTION NO. |
| Plaintiffs, | COMPLAINT |
| vs. | JURY TRIAL DEMANDED |
| AUXILIUM PHARMACEUTICALS, INC. | SECTION |
| Defendant. | |

## **COMPLAINT**

Plaintiffs William Simpson and his wife Melody Simpson ("Plaintiffs"), by and through undersigned counsel, bring this action against Auxilium Pharmaceuticals, Inc. ("Defendant"), and allege the following upon information and belief and investigation of counsel:

## **INTRODUCTION**

1.     This case involves the prescription drug Testim, which is manufactured, sold, distributed and promoted by Defendant, Auxilium Pharmaceuticals, Inc. as a testosterone replacement therapy.

2.     Defendant misrepresented that Testim, is a safe and effective treatment for hypogonadism and a condition referred to as "low testosterone," when in fact the drug causes serious medical problems, including life threatening cardiac events, strokes, and thrombotic events.

3.     Testim causes the hematocrit level to increase, thereby thickening the blood. This effect, if not monitored and controlled properly, can lead to life threatening cardiac events, strokes and thrombolytic events.

4.      Defendant failed to adequately warn physicians about the risks associated with the Testim and the monitoring required to ensure their patients' safety.

5.      Defendant engaged in aggressive consumer and physician marketing and advertising campaigns for Testim.   Further, Defendant engaged in an aggressive unbranded "disease awareness" campaign to alert men that they might be suffering from "Low T" or "low testosterone."  As a result, diagnoses of "Low T" have increased exponentially.

6.      Consumers of Testim were misled as to the drug's safety and efficacy, and as a result have suffered injuries including life-threatening cardiac events, strokes, and thrombotic events.

## PARTIES

7.      Plaintiff William Simpson is an adult citizen and resident of Greenville, North Carolina. Plaintiff William Simpson suffered a stroke in or about September 2011, due to his use of Testim.

8.      Plaintiff Melody Simpson is the spouse of William Simpson. Plaintiff Melody Simpson is an adult resident of Greenville, North Carolina.

9.      Defendant, Auxilium Pharmaceuticals, Inc., is a Delaware corporation which has its principal place of business at 640 Lee Road, Chesterbrook, Pennsylvania 19087. Plaintiffs aver that Defendant conducted business and derived substantial revenue from sales of Testim within the State of Louisiana and North Carolina.

10.     At all times relevant to this Complaint, Defendant was engaged in the business of, or was successor in interest to, entities engaged in the business of designing, licensing, formulating, compounding, testing, manufacturing, processing, assembling, inspecting, distributing, marketing, labeling, promoting, packaging, advertising and introducing into

interstate commerce, either directly or indirectly through third parties or related entities, the prescription testosterone replacement therapy drug sold under the name Testim throughout the United States, including the State of Louisiana and North Carolina.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiffs and Defendant and because the amount in controversy exceeds $75,000, exclusive of interest and cost.

12.     This Court has personal jurisdiction over the Defendant because Defendant is licensed to conduct and/or is systematically and continuously conducting business within this judicial district, including, but not limited to, the marketing, advertising, selling and distributing drugs, including Testim to residents in this district.

13.     This Court has supplemental jurisdiction over any corollary state claims pursuant to 28 U.S.C. § 1367.

14.     Venue is proper within this district pursuant to 28 U.S.C. § 1391 because the Defendant is subject to personal jurisdiction in accordance with 28 U.S.C. § 1391(c) and because Defendant is authorized to conduct business in this district.

## SUMMARY OF THE CASE

15.     This action is brought by Plaintiffs William Simpson and his wife Melody Simpson. Plaintiff William Simpson was prescribed and supplied with, received, taken and applied the prescription drug Testim, as tested, studied, researched, evaluated, endorsed, designed, formulated, compounded, manufactured, produced, processed, assembled, inspected, distributed, marketed, labeled, promoted, packaged, advertised for sale, prescribed, sold or otherwise placed in the stream of interstate commerce by Defendant. This action seeks, among

3

other relief, general and special damages and equitable relief in order to enable Plaintiff William Simpson to treat and monitor the dangerous, severe and life-threatening side effects caused by this drug, as well as the loss of consortium and companionship suffered by his wife, Plaintiff Melody Simpson.

16.     Defendant's wrongful acts, omissions, and fraudulent misrepresentations caused and/or were substantial factors in Plaintiffs' injuries and damages.

17.     At all times herein mentioned, the Defendant was engaged in the business of, or was successor in interest to, entities engaged in the business of research, licensing, designing, formulating, compounding, testing, manufacturing, producing, processing, assembling, inspecting, distributing, marketing, labeling, promoting, packaging and/or advertising for sale or selling the prescription drug Testim for the use and application by Plaintiff William Simpson.

18.     At all times herein mentioned, the officers and directors of Defendant participated in, authorized, and directed the production and promotion of the aforementioned product when it knew, or with the exercise of reasonable care should have known, of the hazards and dangerous propensities of said product and thereby actively participated in the tortious conduct which resulted in the injuries suffered by Plaintiffs herein.

19.     Plaintiffs file this lawsuit within the applicable limitations period of first suspecting that said drugs caused the appreciable harm sustained by Plaintiff William Simpson. Plaintiffs could not, by the exercise of reasonable diligence, have discovered the wrongful case of Plaintiffs' injuries as their cause was unknown.  Plaintiffs did not suspect, nor did Plaintiffs have reason to suspect, that Plaintiffs had been injured, the cause of the injuries, or the tortious nature of the conduct causing the injuries, until less than the applicable limitations period prior to the filing of this action. Additionally, Plaintiffs were prevented from discovering this information

sooner because Defendant misrepresented and continue to misrepresent to the public and to the medical community that the drug Testim is safe and free from serious side effects, and Defendant has fraudulently concealed facts and information that could have led Plaintiffs to discover a potential cause of action.

## OVERVIEW

20.     Hypogonadism is a specific and recognized condition of the endocrine system, which in men may involve the diminished production or nonproduction of testosterone.

21.     Defendant coordinated a massive advertising campaign designed to convince men that they suffered from low testosterone. Defendant orchestrated national disease awareness media blitzes that purported to educate male consumers about the signs of low testosterone. The marketing campaigns included television advertisements and online media and promotional literature placed in healthcare providers' offices as well as distribution to potential testosterone users.

22.     The advertisements suggest that various symptoms often associated with other conditions may be caused by low testosterone and encourage men to discuss testosterone replacement therapy with their doctors if they experienced any of the "symptoms" of low testosterone.  These "symptoms" include listlessness, increased body fat, and moodiness—all general symptoms that are often a result of aging, weight gain, or lifestyle, rather than low testosterone.

23.     Defendant has also sought to convince primary care physicians that low testosterone levels are widely under-diagnosed, and that conditions associated with normal aging could be caused by low testosterone levels.

24.     While running its disease awareness campaign, Defendant promotes its product Testim, as an easy to use, topical testosterone replacement therapy. Defendant contrasts its products' at-home topical application with less convenient prescription testosterone injections, which require frequent doctor visits.

25.     Defendant convinced millions of men to discuss testosterone replacement therapy with their doctors, and consumers and their physicians relied on Defendant's promises of safety and ease.  Although prescription testosterone replacement therapy had been available for years, millions of men who had never been prescribed testosterone flocked to their doctors and pharmacies.

26.     What consumers received, however, were not safe drugs; instead, they received products which cause life-threatening problems, including strokes, heart attacks and thrombotic events.

27.     Defendant successfully created a robust and previously nonexistent market for its drug. The marketing program sought to create the image and belief by consumers and physicians that low testosterone affected a large number of men in the United States and that the use of testosterone is safe for human, even though Defendant knew these claims to be false, and even though Defendant had no reasonable grounds to believe them to be true.

28.     There have been a number of studies concluding that testosterone therapy causes a sudden increase in hematocrit, hemoglobin and estradiol, and associating its use with increased the risk of heart attacks and strokes. Defendant knew or in the exercise of reasonable care should have known that its product, Testim was defectively designed, unreasonable dangerous in normal use, and highly likely to cause injury or death, but it failed to provide adequate warnings about these known risks.

29.    For example, in 2010, a New England Journal of Medicine Study entitled "Adverse Events Associated with Testosterone Administration" was discontinued after an exceedingly high number of men in the testosterone group were suffered adverse events.

30.    In November of 2013, a JAMA study was released entitled "Association of Testosterone Therapy with Mortality, Myocardial Infarction, and Stroke in Men with Low Testosterone Levels" which indicated that testosterone therapy raised the risk of death, heart attack and stroke by about 30%.

31.    On January 29, 2014, a study was released in PLOS ONE entitled "Increased Risk of Non-Fatal Myocardial Infarction Following Testosterone Therapy Prescription in Men" which indicated that testosterone use doubled the risk of heart attacks in men over sixty five years old and men younger than sixty five with a previous diagnosis of heart disease.

## FACTUAL ALLEGATIONS

32.    The Food and Drug Administration (hereinafter "FDA") approved Testim on October 31, 2002, for the treatment of low or no testosterone in adult males.  After FDA approval, Testim was widely advertised and marketed by Defendant as a safe and effective testosterone replacement therapy.

33.    Testim is a hydroalcoholic gel containing testosterone that is applied to the chest, shoulders and upper arms. Testim enters the body through transdermal absorption.

34.    Testosterone is a primary androgenic hormone responsible for normal growth, development of the male sex organs, and maintenance of secondary sex characteristics. The hormone plays a role in sperm production, fat distribution, maintenance of muscle strength and mass, and sex drive. In men, testosterone levels normally begin a gradual decline after the age of thirty.

35.     The average testosterone levels for most men range from 300 to 1,000 nanograms per deciliter of blood. However, testosterone levels can fluctuate greatly depending on many factors, including sleep, time of day, and medication. As a result, many men who fall into the hypogonadal range one day will have normal testosterone levels the next.

36.     Testim may produce undesirable side effects to patients who use the drug, including but not limited to, myocardial infarction, stroke, thrombotic events and death.

37.     In some patient populations, Testim use may increase the incidence of myocardial infarctions and death by over 500%.

38.     Additionally, Testim has been linked to several severe and life-changing medical disorders in both users and those who come into physical contact with users or the unwashed clothes of someone who applied testosterone. Patients taking testosterone may experience enlarged prostates and increased serum prostate-specific antigen levels.

39.     Defendant's marketing strategy beginning in 2002 has been to aggressively market and sell its products by misleading potential users about the prevalence and symptoms of low testosterone and by failing to protect users from serious dangers that Defendant knew or should have known to result from use of its products.

40.     Defendant successfully marketed Testim by undertaking a "disease awareness" marketing campaign.  This campaign sought to create a consumer perception that low testosterone is prevalent among U.S. men and that symptoms previously associated with other physical and mental conditions, such as aging, stress, depression, and lethargy were actually attributable to "Low-T."

41.     The Defendant's advertising program, sought to create the image and belief by consumers and their physicians that the use of Testim was a safe method of alleviating their

symptoms, had few side effects and would not interfere with their daily lives, even though Defendant knew or should have known these to be false, and even though the Defendant had no reasonable grounds to believe them to be true.

42.     Defendant purposefully downplayed, understated and outright ignored the health hazards and risks associated with using Testim. Defendant deceived testosterone potential users by relaying positive information through the press, including testimonials from retired professional athletes, and manipulating hypogonadism statistics to suggest widespread disease prevalence, while downplaying known adverse and serious health effects.

43.     Defendant concealed material relevant information from potential Testim users and minimized user and prescriber concern regarding the safety of Testim.

44.     In particular, in the warnings Defendant gives in its commercials, online and print advertisements, Defendant fails to mention any potential cardiac or stroke side effects and falsely represents that Defendant adequately tested its product, Testim for all likely side effects.

45.     As a result of Defendant's advertising and marketing, and representations about its' product, men in the United States pervasively seek out prescriptions for testosterone.  If Plaintiff William Simpson in this action had known the risks and dangers associated with Testim, he would not have taken Testim and consequently would not have been subject to its serious side effects.

## SPECIFIC FACTUAL ALLEGATIONS

46.     Plaintiff William Simpson was prescribed and used Testim, as directed, for symptoms he attributed to low testosterone as a result of viewing Defendant's advertisements.

47.      After taking multiple doses of Testim between March 2009 and May 2010, Plaintiff William Simpson suffered a stroke in or about September 2011.

48.     Prior to using Testim, Plaintiff William Simpson had no history of blood clots, strokes or significant cardiovascular problems.

49.     The Testim Plaintiff William Simpson used as directed caused physical and emotional impairment which has affected his life.

50.     As a result of the injuries sustained by Plaintiff William Simpson, Plaintiff Melody Simpson, his wife, has suffered injury in the form of loss of consortium and companionship with her husband.

51.     Had Defendant properly disclosed the risks associated with Testim, Plaintiff William Simpson would have avoided the risk of injury, including but not limited to the stroke, by either not using testosterone replacement therapy at all, severely limiting the dosage and length of use, and/or by closely monitoring the degree to which the drugs were adversely affecting his health.

52.     As alleged herein, as a direct, proximate, and legal result of Defendant's negligence and wrongful conduct, and the unreasonably dangerous and defective characteristics of the drug Testim, Plaintiff William Simpson suffered severe and permanent physical and emotional injuries, including, but not limited to a stroke. Plaintiffs have and will sustain significant general and special damages, including medical expenses, lost wages, loss of support, loss of love, affection, and companionship, and other items of recoverable damages for which they seek maximum recovery as allowed by law.  Plaintiffs seek actual and punitive damages from Defendant as alleged herein.

## FEDERAL REQUIREMENTS

53.     Defendant had the obligation to comply with the law in the manufacture, design, and sale of its product, Testim.

54.     Upon information and belief, Defendant violated the Federal Food, Drug and Cosmetic Act, 21 U.S.C. §301, *et seq*.

55.     With respect to the testosterone replacement drug Testim, the Defendant, upon information and belief, has or may have failed to comply with all federal standards applicable to the sale of prescription drugs, including, but not limited to, one or more of the following violations:

    a.     The prescription drug Testim is adulterated pursuant to 21 U.S.C. §351 because, among other things, it fails to meet established performance standards, and/or the methods, facilities, or controls used for its manufacture, packing, storage or installation are not in conformity with federal requirements. *See,* 21 U.S.C. §351.

    b.     The prescription drug Testim is adulterated pursuant to 21 U.S.C.§351 because, among other things, its strength differs from, or its quality or purity falls below, the standard set forth in the official compendium for Testim, and such deviations are not plainly stated on its labels.

    c.     The prescription drug Testim is misbranded pursuant to 21 U.S.C. §352 because, among other things, its' labeling is false or misleading.

    d.     The prescription drug Testim is misbranded pursuant to 21 U.S.C. §352 because words, statements, or other information required by or under authority of chapter 21 U.S.C. §352 are not prominently placed thereon with such conspicuousness and in such terms as to render them likely to be read and understood by the ordinary individual under customary conditions of purchase and use.

e.     The prescription drug Testim is misbranded pursuant to 21 U.S.C. §352 because the labeling does not (i) bear adequate directions for use, and/or (ii) bear adequate warnings against use where its use may be dangerous to health or against unsafe dosage or methods or duration of administration or application, in such manner and form as are necessary for the protection of users.

f.     The prescription drug Testim is misbranded pursuant to 21 U.S.C. §352 because it is dangerous to health when used in the dosage, manner, or with the frequency or duration prescribed, recommended, or suggested in the labeling thereof.

g.     The prescription drug Testim does not contain adequate directions for use pursuant to 21 CFR  §201.5, because, among other reasons, of omission, in whole or in part, or incorrect specification of:

1.   statements of all conditions, purposes, or uses for which it is intended, including conditions, purposes, or uses for which it is prescribed, recommended or suggested in its oral, written, printed, or graphic advertising, and conditions, purposes, or uses for which the drug is commonly used;

2.   quantity of dose, including usual quantities for each of the uses for which it is intended and usual quantities for persons of different ages and different physical conditions;

3.   frequency of administration or application;

4.   duration or administration or application; and/or

5.   route or method of administration or application.

h.    The Defendant violated 21 CFR §201.56 because the labeling of Testim was not informative and accurate.

i.    The prescription drug Testim is misbranded pursuant to 21 CFR §201.56 because the labeling was not updated as new information became available that caused the labeling to become inaccurate, false, or misleading.

j.    The Defendant violated 21 CFR §201.57 by failing to provide information that is important to the safe and effective use of its drugs, including the potential of Testim to cause severe adverse health events, including heart attacks and strokes, and the need for regular and consistent monitoring to ensure that a potentially fatal condition has not developed.

k.    Defendant violated 21 CFR §201.57 because it failed to identify specific tests needed for selection or monitoring of patients who took its prescription drug, Testim.

l.    Defendant violated 21 CFR §201.57 because the safety considerations regarding its prescription drug Testim is such that the drug should be reserved for certain situations, and the Defendant failed to state such information.

m.    The prescription drug Testim is mislabeled pursuant to 21 CFR §201.57 because the labeling fails to describe serious adverse reactions and potential safety hazards, limitations in use imposed by it, and steps that should be taken if they occur.

13

n.  The Defendant violated 21 CFR §201.57 because the labeling failed to list the adverse reactions that occur with its prescription drug Testim and other drugs in the same pharmacologically active and chemically related class.

o.  The Defendant violated 21 CFR §201.57 because the possibility that a patient could develop cardiovascular disease and strokes is significantly more severe than the other reactions listed in the adverse reactions, and yet Defendant failed to list the development of same before the other adverse reactions on the labeling of the prescription drug Testim.

p.  The prescription drug Testim is mislabeled pursuant to 21 CFR §201.57 because the labeling does not state the recommended usual dose, the usual dosage range, and, if appropriate, an upper limit beyond which safety and effectiveness have not been established.

q.  The prescription drug Testim violates 21 CFR §210.1 because the process by which it was manufactured, processed, and/or held fails to meet the minimum current good manufacturing practice of methods to be used in, and the facilities and controls to be used for, the manufacture, packing, or holding of a drug to assure that they meet the requirements as to safety and meet the quality and purity characteristics that they purport or are represented to possess.

r.  The prescription drug Testim violates 21 CFR §210.122 because the labeling and packaging materials do not meet the appropriate specifications.

s.      The prescription drug Testim violates 21 CFR §211.165 because the test methods employed by the Defendant is not accurate, sensitive, specific, and/or reproducible and/or such accuracy, sensitivity, specificity, and/or reproducibility of test methods have not been properly established and documented.

t.      The prescription drug Testim violates 21 CFR §211.165 in that it fails to meet established standards or specifications and any other relevant quality control criteria.

u.      The prescription drug Testim violates 21 CFR §211.198 because the written procedures describing the handling of all written and oral complaints regarding the prescription drug Testim was not followed.

v.      The prescription drug Testim violates 21 CFR § 310.303 in that the prescription drug Testim is not safe and effective for its intended use.

w.      The Defendant violated 21 CFR §310.303 because it failed to establish and maintain records and make reports related to clinical experience or other data or information necessary to make or facilitate a determination of whether there are or may be grounds for suspending or withdrawing approval of its applications to the FDA.

x.      The Defendant violated 21 CFR §§310.305 and 314.80 by failing to report adverse events associated with its prescription drug Testim as soon as possible or at least within 15 days of the initial receipt by the Defendant of the adverse drugs experience.

15

y.     The Defendant violated 21 CFR §§310.305 and 314.80 by failing to conduct an investigation of each adverse event associated with its prescription drug Testim, and evaluating the causes of the adverse events.

z.     The Defendant violated 21 CFR §§310.305 and 314.80 by failing to promptly investigate all serious, unexpected adverse drug experiences and submit follow-up reports within the prescribed 15 calendar days of receipt of new information or as requested by the FDA.

aa.    The Defendant violated 21 CFR §§310.305 and 314.80 by failing to keep records of the unsuccessful steps taken to seek additional information regarding serious, unexpected adverse drug experiences.

bb.    The Defendant violated 21 CFR §§310.305 and 314.80 by failing to identify the reports they submitted properly, such as by labeling them as "15-day Alert report," or "15-day Alert report follow-up."

cc.    The Defendant violated 21 CFR §312.32 because it failed to review all information relevant to the safety of its prescription drug Testim or otherwise received by the Defendant from sources, foreign or domestic, including information derived from any clinical or epidemiological investigations, animal investigations, commercial marketing experience, reports in the scientific literature, and unpublished scientific papers, as well as reports from foreign regulatory authorities that have not already been previously reported to the agency by the sponsor.

dd.    The Defendant violated 21 CFR §314.80 by failing to provide periodic reports to the FDA containing the following:

1. narrative summaries and analysis of the information in the report and an analysis of the 15-day Alert reports submitted during the reporting interval;

2. an Adverse Reaction Report for each adverse drug experience not already reported under the Post marketing 15-day Alert report; and/or

3. a history of actions taken since the last report because of adverse drug experiences (for example, labeling changes or studies initiated).

ee. Defendant violated 21 CFR §314.80 by failing to submit copies of published articles from scientific or medical journals along with one or more 15-day Alert reports based on information from the scientific literature.

56. The Defendant failed to meet the standard of care set by the above statutes and regulations, which were intended for the benefit of individual consumers such as Plaintiffs, making the Defendant liable under the law.

## **FRAUDULENT CONCEALMENT**

57. Defendant failed to disclose a known defect and affirmatively misrepresented that Testim was safe for its intended use. Further, the Defendant actively concealed the true risks associated with the use of Testim. Neither Plaintiffs nor Plaintiffs' prescribing physicians had knowledge that Defendant was engaged in the wrongdoing alleged herein. Because of Defendant's concealment of and misrepresentations regarding the true risks associated with

Testim, Plaintiffs could not have reasonably discovered Defendant's wrongdoing at any time prior to the commencement of this action.

58.     Thus, because Defendant fraudulently concealed the defective nature of Testim and the risks associated with its use, the running of any statute of limitations has been tolled. Likewise, Defendant is estopped from relying on any statute of limitations.

## CAUSES OF ACTION

### COUNT ONE

**LOUISIANA PRODUCTS LIABILITY ACT**
**DEFECT IN CONSTRUCTION OR COMPOSITION UNDER LSA R.S. § 9:2800.55**

59.     Plaintiffs hereby restate and re-allege each and every allegation set forth above, with the same force and effect as if herein repeated and set forth at length.

60.     The characteristics of Testim that renders it unreasonably dangerous in construction or composition existed at the time the product left the control of Defendant or resulted from a reasonably anticipated alteration or modification of the product.

61.     Defendant sold and/or distributed Testim in a condition that posed unreasonable risks from reasonably anticipated use of the product. Testim was expected to and did reach Plaintiffs without substantial change in condition from the time that it left the control of Defendant.

62.     At all times mentioned herein, Defendant directly and indirectly, researched, designed, developed, tested, inspected, manufactured, compounded, packaged, advertised, promoted, labeled, distributed, marketed, and/or sold Testim in a condition which rendered the product unreasonably dangerous due to its propensity to cause serious injuries including but not limited to heart attacks, strokes, pulmonary embolism, cardiovascular events and blood clots. As

such, Testim was unreasonably dangerous in construction and/or composition as provided for in LA R.S. §9:2800.55.

63.      As a direct and proximate result of Testim's defects in composition and/or construction, Plaintiffs have suffered and will continue to suffer severe and permanent injuries and/or damages.

**COUNT TWO**

**LOUISIANA PRODUCTS LIABILITY ACT**
**DESIGN DEFECT UNDER LSA R.S. § 9:2800.56**

64.      Plaintiffs hereby restate and re-allege each and every allegation set forth above, with the same force and effect as if herein repeated and set forth at length.

65.      At all times mentioned herein, Defendant had a duty to properly manufacture, design, formulate, compound, test, produce, process, assemble, inspect, research, distribute, market, label, package, distribute, prepare for use, sell, prescribe and adequately warn of the risks and dangers of Testim.

66.      Despite the fact that Defendant knew or should have known that Testim caused unreasonable, dangerous side effects, Defendant continued to market Testim to consumers including Plaintiffs, when there were safer alternative methods of treating loss of energy, libido erectile dysfunction, depression, loss of muscle mass and other conditions Testim's advertising claims are caused by low testosterone.

67.      Testim is defective in its design or formulation in that it is not reasonably fit, suitable or safe for its intended purpose and/or its foreseeable risks exceed the benefits associated with its design and formulation.

68.      At all times mentioned herein, Testim was not safe or suitable for the purposes for which Defendant, directly and indirectly, designed, manufactured, advertised, marketed,

promoted, distributed and sold Testim to Plaintiffs and placed the drug into the stream of commerce.

69.     Testim, sold to and used by the Plaintiffs, was defective and unreasonably dangerous when it left control of the Defendant in one or more of the following ways:

> a.     The risk associated with the use of Testim far outweighed the utility derived from using the medication;
>
> b.     Defendant failed to provide adequate warnings regarding the hazards associated with the use of Testim; and
>
> c.     Defendant's product was defectively designed and unreasonably dangerous in design and composition in that other medications could achieve similar results without the risks associated with the use of Testim.

70.     In addition, at the time of the Testim used by Plaintiffs left the control of the Defendant, there were practical and feasible alternative designs that would have prevented and/or significantly reduced the risk of Plaintiffs' injuries without impairing the reasonably anticipated or intended function of the product. These safe alternative designs were economically and technologically feasible, and would have prevented or significantly reduced the risk of Plaintiffs' injuries without substantially impairing the product's utility.

71.     As a direct and proximate result of Testim's defective design, Plaintiffs have suffered and will continue to suffer severe and permanent injuries and/or damages.

## COUNT THREE

### LOUISIANA PRODUCTS LIABILITY ACT
### INADEQUATE WARNING UNDER LSA R.S. § 9:2800.57

72.     Plaintiffs hereby restate and re-allege each and every allegation set forth above, with the same force and effect as if herein repeated and set forth at length.

73.     Defendant knew, or in light of reasonably available scientific knowledge, should have known that Testim was dangerous and caused serious side effects including but not limited to heart attacks, strokes, pulmonary embolism, cardiovascular events and blood clots. The ordinary user or consumer of Testim would not have realized such dangers.

74.      Despite this knowledge, Defendant failed to provide users or consumers, including Plaintiffs, and Plaintiffs' physicians with warnings and other clinically relevant information and data regarding the risks and dangers associated with Testim, as it became or could have become available to Defendant.

75.     Defendant neglected to provide Plaintiffs with any warning which could have been expected to catch the attention of a reasonably prudent person under similar circumstances who may have purchased Testim. Furthermore, Defendant failed to provide warnings to Plaintiffs which could accurately advise them or an ordinary consumer of the scope, severity and likelihood of serious injury resulting from the use of Testim. Had such warnings been provided, Plaintiff William Simpson would have avoided the risk and dangers associated with Testim by either not taking the drug at all, by severely limiting the dosage and length of use, and/or by closely monitoring the degree to which the drugs were adversely affecting his health. As such, the severe and permanent injuries and/or damages sustained by Plaintiffs could have been prevented.

76.     Defendant failed to adequately warn consumers and/or their health care providers that Testim could cause heart attacks, strokes, pulmonary embolisms, cardiovascular events and blood clots.

77.     Defendant failed to adequately warn consumers and/or their health care providers that while a patient was taking Testim it was necessary to frequently monitor their patients to prevent heart attacks, strokes, pulmonary embolisms, cardiovascular events and blood clots.

78.     The Testim manufactured and/or supplied by Defendant was defective due to inadequate post-marketing warnings or instructions because, after Defendant knew or should have known of the risk of serious bodily harm from the use of Testim, Defendant failed to provide an adequate warning to consumers and/or their health care providers of the product, knowing the product could cause serious injury.

79.     As a direct and proximate result of Testim's defective and inadequate warnings, Plaintiffs have suffered and will continue to suffer severe and permanent injuries and/or damages.

## COUNT FOUR

### LOUISIANA PRODUCTS LIABILITY ACT
### BREACH OF EXPRESS WARRANTY UNDER LSA R.S. § 9:2800.58

80.     Plaintiffs hereby restate and re-allege each and every allegation set forth above, with the same force and effect as if herein repeated and set forth at length.

81.     At all times mentioned herein, Defendant directly and indirectly, researched, designed, developed, tested, inspected, manufactured, compounded, packaged, advertised, promoted, labeled, distributed, marketed, and/or sold Testim for the treatment of low testosterone and placed the drug into the stream of commerce.  In doing so, Defendant expressly warranted, orally and in publications, package inserts, and other written materials intended for physicians, medical patients, and to all foreseeable users of the drug, including Plaintiffs, directly and through their prescribing physicians, that Testim was safe, effective and proper for its intended use.

82.     Plaintiffs reasonably relied, directly and through their prescribing physician, upon Defendant's skill, superior knowledge, and judgment upon the aforesaid express warranty provided by Defendant.  Plaintiffs purchased Testim relying upon these warranties.

83.     Upon being prescribed Testim, Plaintiff William Simpson's use of Testim was consistent with its intended purpose for which Defendant directly and indirectly advertised, marketed, and promoted Testim. Plaintiff William Simpson's use of Testim was reasonably contemplated, intended, and foreseen by Defendant at the time of distribution and sale of Testim and therefore, his use of the drug is within the scope of the express warranties issued by the Defendant.

84.     Defendant breached the express warranties because Testim was not safe or fit for its intended uses.

85.     As a direct and proximate result of Defendant's breach of express warranties, Plaintiffs have suffered and will continue to suffer severe and permanent injuries and/or damages.

**COUNT FIVE**

**BREACH OF WARRANTY OF REDHIBITION**

86.     Plaintiffs hereby restate and re-allege each and every allegation set forth above, with the same force and effect as if herein repeated and set forth at length.

87.     Testim contains a vice or defect which renders it useless or its use so inconvenient that consumers would not have purchased it had they known about the vice or defect.

88.     Pursuant to Louisiana Civil Code Article 2520, a seller warrants the buyer against redhibitory defects, or vices, in the thing sold. Testim which was sold and promoted by Defendant possesses a redhibitory defect because it was not manufactured and marketed in

accordance with industry standards and/or is unreasonably dangerous, as described above, which renders Testim useless or so inconvenient that it must be presumed that Plaintiffs would not have purchased the drug had they known of the defects.

89.     Defendant was aware of the substantial risks from using Testim but failed to fully disclose those risks to the Plaintiffs.

90.     In accordance with Louisiana Civil Code Article 2445, Defendant, as a manufacturer of Testim, is deemed to be aware of its redhibitory defects.

91.     Had Plaintiffs been made aware of the defects contained in Testim, Plaintiffs would not have purchased the drug. The characteristics rendered Testim unfit for its intended uses.

92.     Defendant is liable to Plaintiffs under the theory of redhibition as a consequence of the sale to Plaintiffs of a product unfit for its intended use.

93.     Plaintiffs are entitled to the return of any purchase price paid, including but not limited to, insurance co-payments, interest on these amounts from the date of purchase, attorneys' fees and costs, pecuniary and non-pecuniary damages, as well as any other legal and equitable relief to which Plaintiffs may be entitled.

94.     As a result of the failures described herein, Plaintiffs have suffered and will continue to suffer severe and permanent injuries and/or damages.

## COUNT SIX

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY AND FITNESS

95.     Plaintiffs hereby restate and re-allege each and every allegation set forth above, with the same force and effect as if herein repeated and set forth at length.

96.     At all relevant times herein, Defendant knew of the use for which its product, Testim was intended and impliedly warranted this product to be of merchantable quality and safe and fit for such use.

97.     Defendant was aware that consumers, including Plaintiffs, would use Testim for treatment or prevention of male hypogonadism or low testosterone.

98.     Plaintiffs and the medical community reasonably relied upon the judgment and sensibility of Defendant to sell its product, Testim, only if it was indeed of merchantable quality and safe and fit for its intended use.

99.     Defendant breached its implied warranty to consumers, including Plaintiffs, as its product, Testim was not of merchantable quality or safe and fit for its intended use.

100.     Consumers, including Plaintiffs and the medical community, reasonably relied upon Defendant's implied warranties for its product, Testim.

101.     Testim reached consumers, including Plaintiffs, without substantial change in the condition in which it was manufactured and sold by the Defendant.

102.     As a direct and proximate result of Defendant's breach of implied warranties, Plaintiffs have suffered and will continue to suffer severe and permanent injuries and/or damages.

## **COUNT SEVEN**

### **FRAUD**

103.     Plaintiffs hereby restate and re-allege each and every allegation set forth above, with the same force and effect as if herein repeated and set forth at length.

104.     Defendant from the time it first tested, studied, researched, evaluated, endorsed, manufactured, marketed and distributed Testim, and up to the present, willfully deceived

Plaintiffs by concealing from them, Plaintiffs' physicians and the general public, the true facts concerning Testim, which the Defendant had a duty to disclose.

105.    At all relevant times herein, Defendant conducted a sales and marketing campaign to promote the sale of Testim and willfully deceive Plaintiffs, Plaintiffs' physicians and the general public as to the benefits, health risks and consequences of using Testim. Defendant knew of the foregoing, that Testim is not safe, fit and effective for human consumption, that using Testim is hazardous to health, and that Testim has a serious propensity to cause serious injuries to its users, including but not limited to the injuries Plaintiffs suffered.

106.    Defendant concealed and suppressed the true facts concerning Testim with the intent to defraud Plaintiffs, in that Defendant knew that Plaintiffs' physicians would not prescribe Testim, and Plaintiffs would not have used Testim, if they were aware of the true facts concerning its dangers.

107.    As a result of Defendant's fraudulent and deceitful conduct, Plaintiffs have suffered and will continue to suffer severe and permanent injuries and/or damages as alleged herein.

## COUNT EIGHT

### NEGLIGENT MISREPRESENTATION

108.    Plaintiffs hereby restate and re-allege each and every allegation set forth above, with the same force and effect as if herein repeated and set forth at length.

109.    From the time Testim was first tested, studied, researched, evaluated, endorsed, manufactured, marketed and distributed, and up to the present, Defendant made misrepresentations to Plaintiffs, Plaintiffs' physicians and the general public, including but not limited to the misrepresentation that Testim was safe, fit and effective for human consumption.

At all relevant times herein, Defendant conducted a sales and marketing campaign to promote the sale of Testim and willfully deceive Plaintiffs, Plaintiffs' physicians and the general public as to the health risks and consequences of the use of the abovementioned product.

110.    The Defendant made the foregoing representation without any reasonable ground for believing them to be true. These representations were made directly by Defendant, by sales representatives and other authorized agents of Defendant, and in publications and other written materials directed to physicians, medical patients and the public, with the intention of inducing reliance and the prescription, purchase and use of the subject product.

111.    The representations by the Defendant were in fact false, in that Testim is not safe, fit and effective for human consumption, using Testim is hazardous to health, and Testim has a serious propensity to cause serious injuries to users, including but not limited to the injuries suffered by Plaintiffs.

112.    The foregoing representations by Defendant were made with the intention of inducing reliance and the prescription, purchase and use of Testim.

113.    In reliance of the misrepresentations by the Defendant, Plaintiffs were induced to purchase and use Testim.  If Plaintiffs had known of the true facts and the facts concealed by the Defendant, Plaintiffs would not have used Testim. The reliance of Plaintiffs upon Defendant's misrepresentations was justified because such misrepresentations were made and conducted by individuals and entities that were in a position to know the true facts.

114.    As a result of the foregoing negligent misrepresentations by Defendant, Plaintiffs suffered injuries and damages as alleged herein.  Plaintiffs have and will sustain the following non-exclusive damages including physical injuries, past, present, and future emotional distress; past, present and future mental pain and suffering; inconvenience; past, present and future

physical pain, suffering and disability; past, present and future medical expenses; economic damages; diminished capacity for the enjoyment of life, loss of love and affection, and loss of consortium and other damages to be proven at the trial of this matter.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment against Defendant as follows:

A.   Plaintiffs be granted a trial by jury in this matter;

B.   The Court enter judgment against Defendant for all general and compensatory damages allowable to Plaintiffs;

C.   The Court enter judgment against Defendant for damages for loss of care, comfort, society, companionship and consortium and other damages allowable to Plaintiffs;

D.   The Court enter judgment against Defendant for all other special damages allowable to Plaintiffs;

E.   The Court enter judgment against Defendant for restitution, disgorgement of profits, and other equitable relief;

F.   The Court enter judgment against Defendant for punitive or exemplary damages according to proof on the proper causes of action and in an amount sufficient to impress upon Defendant the seriousness of its conduct and to deter similar conduct in the future;

G.     The Court enter judgment against Defendant for all other relief sought by Plaintiffs under this Complaint;

H.     The Court render judgment in favor of the Plaintiffs awarding all damages as prayed for herein, including attorneys' fees, with costs assessed against Defendant; and

I.     The Court grant Plaintiffs all such other and further relief as the Court deems just and proper.

Dated: April 23, 2014

RESPECTFULLY SUBMITTED,

*/s/ James R. Dugan, II*
James R. Dugan, II (LSBA# 24785)
Douglas R. Plymale
David B. Franco
Chad Primeaux
THE DUGAN LAW FIRM, APLC
One Canal Place
365 Canal Street, Suite 1000
New Orleans, Louisiana 70130
Telephone: (504) 648-0180
Facsimile: (504) 648-0181
Email: jdugan@dugan-lawfirm.com

***Attorneys for Plaintiffs***